## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHWESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Criminal Action |
| | ) No. 09-05007-01-CR-SW-RED |
| THOMAS E. RULEY, | ) |
| | ) |
| Defendant. | ) |

### REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Defendant filed a Motion to Suppress Evidence, in which he asserts that evidence seized and statements made as a result of a search of his residence on July 4, 2008, should be suppressed. The United States filed its response. The matter was set for an evidentiary hearing, which was held before the undersigned on August 10, 2009. The defendant was present with counsel, Michelle Nahon, Assistant Federal Public Defender, and the United States was represented by Randall Eggert, Assistant United States Attorney.

The government first called Timothy Bullard, who is a firefighter for the city of Nevada, Missouri. On July 4, 2008, he came into contact with defendant. On that afternoon, he was dispatched to defendant's residence in Nevada, via a 911 dispatch, regarding an electrical emergency. Officer Bullard met defendant at the front door. Defendant stated that he'd lost power in the house while using a microwave, and that he had then observed a strong electrical odor. The firefighters began to investigate the situation to find anything that could have caused the electrical

1

problem. They checked the basement, living room, kitchen, dining room, and attic. They asked for consent to enter the residence to search for the problem, and defendant agreed to let them enter his home. They could not find anything that would be directly related to the problem he described. After checking those areas, and not finding anything, the officer realized that he had not checked the bedrooms. He then asked defendant if he could check the remaining rooms in the house. Defendant agreed to let them search the other rooms. Defendant was friendly, congenial, welcoming, and helpful. Officer Bullard testified that because defendant had lost power and there had been an odor that had dissipated, he "didn't want there to be a problem that we would miss that would later result in a fire that we would have to respond back for." [Tr. at 9]. He went into the bedroom, through the bathroom, and into another bedroom, making a visual sweep of each room, looking for anything that might have caused the electrical problem. He didn't see anything, and then went back into the first bedroom, where he noticed a closet door, which he opened. As the officer opened the door, defendant stated that there was nothing in there, but did not try to block access or to shut the door. When the officer opened the closet door, he saw numerous power cords, surge protectors, electrical timers, and what appeared to be clay flower pots beneath a florescent light fixture. Defendant then pushed the door closed with his hand and stated that "I don't want to talk about that." [Tr. 13].

Firefighter Bullard acknowledged that this is the second time that he has testified about this event. The officer stated that he previously testified on March 10, 2009, at a state suppression hearing involving defendant and the search of his residence. He testified that his most accurate remembrance of what happened is reflected in his written statement concerning the events in question, which was written immediately after the incident. [Joint Exhibit 3, "Voluntary

2

Statement"]. He agreed that there were a few differences between his testimony in state court and his original report, and his report is the most accurate. At the state court hearing, he had testified that he saw a light coming out from the bedroom closet, which is not reflected in his report. Officer Bullard stated that he did not have his report at the state court hearing, and that he testified incorrectly there about the light. He also testified in state court that defendant put his hand on the door before he opened it. His written statement indicates that the door was opened and he had seen the items in the closet before defendant put his hand on the door. After seeing inside the closet, the officer told defendant at the time that this arrangement was the probable cause for his electrical problem, and that he believed it to be both dangerous and illegal as well.

Officer Bullard then called the dispatcher to contact the Nevada Police Department and send a law enforcement officer because he felt this had become a legal issue. Officer Jeff Baker arrived on the scene a short time later, and Officer Bullard told him what had happened. Officer Baker then spoke to defendant on the front porch. Defendant was still friendly, helpful, and seemed resigned. The witness did not see Officer Baker act threatening towards defendant. Another officer, Detective Casey Crain, arrived. Neither Officer Bullard nor Detective Crain talked to defendant during this time. While Officer Bullard was still there, the police officers and defendant went inside the residence. The total time the officer was there was less than twenty minutes.

On cross examination, Officer Bullard testified that there were four firefighters searching the house. When the police officers showed up, he briefed them on the situation and then departed. He thought that the initial dispatch was that there was no smoke or fire coming from the residence, and there was neither while he was there. According to the initial dispatch, there was merely an electrical disturbance. They had looked in all the rooms by the end of the investigation, and there

3

was no visible sign of smoke or flames in any of the rooms. He denied that he wanted to sweep the house one more time, but rather, that he asked to check the bedrooms that had not been previously checked. He acknowledged that he did not ask for specific permission to check the closets. Officer Bullard admitted that his memory was faulty when he testified at the state court hearing. Today, in reliance on his written statement, he is testifying that there was no light emanating from the closet. The officer also admitted that there was no smoke or fire coming from the closet, that he did not have any reason to open the door to save a life or the house, and that he had no reason to believe that a crime was being committed in the house. He testified that he used a thermal energy device that day, and it did not disclose anything that was hot. He did not include any mention of the device in his report. After opening the closet door, he told defendant that he was calling the police; defendant was standing next to him when he made the call. Officer Bullard admitted that he never told defendant that the police officers should have a warrant before entering his house. He admitted that, had he not seen the pots on the floor or opened the closet door, he would not have called the police. He acknowledged that nothing was found from the attic to the basement, with the exception of what he saw in the closet, and that the electrical odor had dissipated before he opened the closet door.

On redirect examination, Officer Bullard testified that when he asked for consent to search the residence, he asked to search the remaining rooms. When he gained consent, he felt it included any area that had not already been checked. When he approached the closet door, defendant did not say not to search there or to stop searching, according to his present testimony. The purpose of his search was to find a possible electrical problem that could have been the source of the smell.

On recross examination, Officer Bullard admitted that he testified at the state court hearing that he asked specifically to check the two bedrooms. He is now testifying that he had a faulty

4

memory on that issue.

The government next called Sergeant Jeff Baker of the Nevada Police Department. He received a dispatcher's call regarding a possible electrical fire at defendant's residence. He arrived on the scene before the fire department did. He drove by, checking the area, and did not locate any smoke or fire, nor did he come into contact with defendant at that time. He stayed mobile and then the fire department arrived. After a few minutes, he received another call from dispatch asking him to return to the residence. He submitted a report later that evening regarding the events that took place. [Joint Exhibit 8]. When he arrived at the scene, Officer Bullard and defendant were on the front porch. Officer Bullard told him that there was an electrical problem and about opening the closet. He told him that defendant tried to keep the door from being opened. He was not told that defendant made a verbal statement to not look in the closet. Officer Bullard told him that he saw pots and a florescent light. After Sergeant Baker heard this, he then asked defendant if he was growing the marijuana for sale or for use. In response, defendant had said it was more for use and not for sale. Sergeant Baker then called Sergeant Crain to come to the scene to assist him. He met Sergeant Crain with defendant on the front porch of the residence. Sergeant Crain asked defendant if they could search the residence. Defendant was very polite, cooperative, and was not agitated. No weapons were drawn; the officers were in uniform. When Sergeant Crain made the request to search, Sergeant Baker testified that defendant said, "yes, you guys can come on in and search." [Tr. 42]. During the subsequent search, Sergeant Crain found long guns, a handgun, and some marijuana in the bedroom. Defendant was not handcuffed, was allowed to move about the house, and was allowed to get a drink of water, although the officer went with him because weapons had been found. Another officer responded to the scene, Officer James Moore, and sat with defendant, who

was slapping his forehead and saying, "Stupid, Stupid, Stupid, Stupid." [Tr. 45]. Sergeant Baker stated that he did look inside the closet, and saw the marijuana growing operation. Officer Barclay arrived a short time later to help with the search. This officer came to Sergeant Baker and told him that he found a CD that had "PC porn" written on it. [Tr. 46]. Sergeant Baker asked defendant what was on the CD, and he said it was personal pornography. Sergeant Baker testified that he did not specifically ask if it was child pornography. Officer Barclay asked to take the CDs, and defendant said they could. As Sergeant Baker was leaving the scene, he saw defendant talking to Officer Barclay. He did not arrest defendant, handcuff him, or otherwise put him into custody. Defendant was very nervous, but he was cooperative and pleasant. Sergeant Baker testified at the state suppression hearing on March 10, 2009. If there was any conflict, his written report would be more accurate.

On cross examination, Sergeant Baker reiterated that the report he wrote was the most accurate reflection of the events on that day. In his report, it states that Officer Bullard told Sergeant Baker that there were clothes in front of the closet door, that he tried to pull the door open, and that defendant tried to stop him by holding the door shut. He denied that defendant wasn't free to leave, even though he accompanied him to get a drink of water. He admitted that he did not tell defendant that he was not free to leave, but defendant did not ask. He agreed that there was no smoke and no evidence of a fire at the scene. According to Sergeant Baker, defendant told them they could go inside because they already knew about the lights. He did not tell defendant he had the right to refuse to allow them to enter the house, or to request a warrant, even though they were investigating a crime at that point. The officer acknowledged that his report said that defendant was told to remain in a chair for officer safety while Officer Crain searched the bedroom. He testified at the

instant hearing, however, that the officers did not have defendant sit in the living room until after they had begun searching and had found the handguns and the long gun in the bedroom. Sergeant Baker admitted that he had testified at the state court hearing that there were no plants in the pots and the electricity was not on. He agreed that the guns, in and of themselves, were not illegal, nor is the possession of pornography. Ultimately, there were three police officers searching the house, and one with defendant. He did not read defendant his <u>Miranda</u> rights. Defendant was not told that he did not have to answer any questions. He did not receive a written consent form from defendant to search the house.

The government next called Captain Casey Crain of the Nevada Police Department to the witness stand. He was called to the residence by Sergeant Baker. After the events occurred, he prepared an incident report. When he arrived there, he met with Sergeant Baker and defendant on the front porch. Sergeant Baker informed him of what was going on. Captain Crain than spoke to defendant, who was cooperative. He asked defendant if they could take a look. The officer testified that defendant told him that "he was growing marijuana for personal use and invited us back into the residence to show us what he had." [Tr. 60]. Defendant led him back to the closet in the bedroom, where the officer saw the marijuana growing operation. He then asked for and received verbal consent to search the rest of the residence. Defendant was with him, and indicated that he had some more marijuana in a night stand in the bedroom. "He escorted me over there and opened the drawer to the night stand." [Tr. 60]. The drawer contained two bags of marijuana, next to a loaded handgun. Defendant was still cooperative, and was not arrested. After he found the handgun, the officer asked him to have a seat in the living room with Sergeant Baker for officer safety. When asked if he had more weapons, defendant said he did–that he had another loaded

Case 3:09-cr-05007-MDH   Document 35   Filed 09/09/09   Page 7 of 22

handgun in the living room in a desk and two rifles behind the bedroom door. Captain Crain found those weapons, and he also found some marijuana paraphernalia and some pills. During the time that the search was being conducted, Officers Barclay and Moore came to the residence to assist in the search. Officer Barclay advised Captain Crain that he found some computer disks that were labeled as pornography. As the officers were preparing to leave the residence, defendant approached him, and told him that the computer disks and flash drive they were taking contained images of child pornography. He stated that he was telling the officers this because he wanted to be honest. At that point, the officers asked for defendant's consent to take all the CDs that they found at the residence, two flash drives, and five computer towers. Defendant let them take everything. He was honest and cooperative the whole time. Captain Crain testified that he was on the scene about an hour and forty minutes. He stated that he had also testified at the state court suppression hearing, and that if there are any inconsistencies, his written report would be the most accurate.

On cross examination, the officer admitted that in neither his written statement nor his probable cause statement did he specifically say that defendant gave his consent upon request, but rather, that he invited the officers into the residence. It was his testimony that he was in uniform with a firearm. He admitted that no warnings were ever given to defendant, and that he did not enter the home because of a fire. There was no written consent form.

The United States next called Officer James Barclay of the Nevada Police Department to the stand. He assisted Captain Crain in the search and was with him when they found the additional marijuana and the handgun in the night stand drawer. In a second drawer in the night stand, he noticed that the interior of the drawer was smaller than the top drawer, and discovered a false bottom

underneath some clothing. He found three computer disks labeled "PC Porn" and a computer thumb drive. [Tr. 73]. He took them into the living room where defendant was seated and asked him if there was any child pornography on those items, which defendant denied. He asked if he could take them to be examined by a computer forensics lab, and defendant stated that he could. They continued to search the residence, during which time he found several more guns, some other thumb drives, and some computer towers. As they were preparing to leave, defendant came out on the porch to advise Officers Barclay and Crain that there was child pornography on the CDs. Upon request, defendant gave consent to take all the computer equipment. A few days later, another officer, Steven Barstow, with the Nevada Police Department, went back to obtain a consent to search the interior of the computer towers and the thumb drives. According to Officer Barstow's statement, defendant declined to sign the consent form.

On cross examination, the officer acknowledged that when defendant was advised of his right to refuse consent by Officer Barstow, he did so. The officer stated that the CDs were found in a false bottom of a drawer, but that he omitted this information from his report. He thought that "PC Porn" was handwritten on the CDs. Due to the fact that the CDs were concealed in a drawer in the bedroom of where defendant lived alone, it made him suspicious that it might be child pornography. He never advised defendant of any of his rights during the hour or more that he was there.

Defendant testified on his own behalf. It was his testimony that he has a Master of Fine Arts Degree from Drake University, and had years of employment in the printing industry, computer industry, and with Internet companies. On the day in question, he stated that he called 911 because his microwave shorted out, and then the lights blew out in the kitchen. He could smell an odor like burning electrical insulation. Defendant then called 911; he did advise the dispatcher that there was

9

no smoke or fire.  During the search of his residence, defendant testified that he did not give the officer permission to open the closet door.  It was his testimony that the firefighter asked to "do a walk through of the bedrooms.  I went with him.  He looked around a little and began to open the closet.  I put my hand on the closet door, pushed it shut and told him that he didn't need to look in there." [Tr. 81-82].  He testified that the officer insisted on opening the closet door, and after looking at the contents, said he was calling the police.  The officer then asked him to come out onto the front porch while they waited for the police to arrive.  When the police got there, they told him that they didn't need his permission to search because he had already given it to the fire department, but they would like to have his consent to search in any event.  He consented because he thought he had no choice.  They didn't tell him he had a right to refuse, nor did they read him his <u>Miranda</u> rights.  He went with Detective Crain who wanted him to show him where the growing operation was, which he did. The detective also asked if there was any other marijuana in the house.  He said there was, and  the officer took the marijuana from the drawer.  At that point, he wasn't sure if he told him there was a handgun or if the officer just discovered it.  After that, they asked him to go sit in the dining room.  He got up several times from the chair and asked for a glass of water, which he got, accompanied by the police.  As the investigation progressed, he became more agitated and stood up several times. At one point, an officer told him to sit back down, and put his hand on his taser.  He did not feel free to leave.    At least four police officers were there.  On July 8, 2008, when he was presented with a consent to search form, he denied consent and did not sign the form.  Regarding Officer's Barclay statement that he found a disk and a thumb drive in a false bottom of one of his dressers, defendant testified that  he did not have a false bottom in one of his dresser drawers.  No officer read him his rights, and no one told him that he had a right to refuse the officers entry into

10

his home.

On cross examination, defendant testified that when he called 911, he knew that there was a marijuana grow in his closet. He agreed that he wasn't sure where the burning electrical smell was coming from. Defendant acknowledged that he never said the problem was limited to his kitchen, although the smell was concentrated in the kitchen. Officer Bullard asked for consent to search the kitchen, the living room, and dining room. Defendant admitted that he gave consent. He never told the firefighter that the fire or smoke was concentrated in these rooms. Defendant acknowledged that he told the officer that he smelled smoke in his house and wanted them to investigate. After the firefighter searched these rooms, defendant recalled that the officer wanted to walk through the bedrooms, and he gave consent to do that. He admitted that he did not tell him that he could not search the closet. When Officer Bullard approached the closet door, he put his hand on the door and told the officer "not to look in there." [Tr. 90]. He agreed that it was possibly correct that he said there was nothing in there. He stated that the officer went ahead and opened the closet door anyway. He did not recall that Officer Bullard told him that he had to open the door to continue to search for the source of the electrical fire. He agreed that, even though it is his testimony that the officers said they did not need permission to search the residence because he had already given the fire department permission, they asked anyway. He admitted that he allowed them to enter the residence. He was never handcuffed. Defendant agreed that he was cooperative, although he was agitated, but he tried not to act that way. Defendant acknowledged that he went with Captain Crain into his bedroom and showed him where he would find the marijuana and handgun. He was not sure which officer put his hand on the taser, but he acknowledged that the officer did not draw the taser. As the officers were leaving the residence, defendant agreed that it

was on his own initiative that he told them there was child pornography on the thumb drive. He agreed to let them take the other computer equipment at that time.

Defendant contends that in light of the totality of the circumstances in this case, he did not give Officer Bullard of the Nevada Fire Department consent to search the closet of his residence. He asserts that his words, when he told Officer Bullard that there was nothing in the closet, and his actions, when he physically tried to hold the closet door shut, clearly indicated that he did not consent to the search of the closet. Without Officer Bullard's actions in opening the closet door, the items therein would not have been discovered and the subsequent search would not have occurred. Additionally, defendant contends that there was no fire or other exigency in this case that would support a warrantless search of the closet. It is his position that, under the "fruit of the poisonous tree" doctrine, evidence obtained as a direct result of an illegal search must be suppressed. Regarding the argument that his subsequent consent validated the prior illegal search, he contends that he only yielded to the authority of the Nevada Police Department when they told him that they could, or would, search without his consent; accordingly, he asserts that his consent was not voluntary, as evidenced by his refusal to grant consent a few days later. Defendant also contends that statements he made were in violation of his Miranda rights because they were made while he was in custody and in response to interrogation. He asserts that a reasonable person in his position would not have thought he was free to leave his home, given that four police officers were searching his home, wearing weapons, and continually interrogating him about items they were seizing. Defendant submits that all items seized and all statements made by him should be suppressed.

It is the government's position that defendant's consent to search his house was informed and voluntary, and the defendant did not unequivocally withdraw that consent during the search by

Case 3:09-cr-05007-MDH   Document 35   Filed 09/09/09   Page 12 of 22

Nevada Firefighter Bullard. It is asserted that the facts do not support defendant's position regarding having withdrawn his consent to search the closet, and that a statement to the effect that there was nothing in the closet was not an unequivocal statement withdrawing consent. The government contends that defendant placing his hand on the closet door was not clearly an act to physically prevent Firefighter Bullard from opening the door because this occurred after Bullard had already seen the items in the closet and was not accompanied by a clear command to stop the search. It is argued, moreover, that even if defendant's statement served as a withdrawal of consent, that withdrawal was temporary when Bullard informed defendant that the reason to search the closet was to insure that there was no electrical problem, and that defendant consented to the continued search. The government contends that because the first search was a proper consensual search, the subsequent consent search by the Nevada Police was also proper and did not create a "fruit of the poisonous tree" issue. Additionally, it is asserted that the second request for consent was not coercive, because defendant indicated that the officers could search his house because they already knew about the marijuana. Regarding the statements defendant made, the government asserts that these were not in violation of his Fifth Amendment rights because they were not the result of a custodial interrogation. Specifically, in regard to the statements he made about his possession of firearms and child pornography, it is contended that defendant was not in custody when encountering the police at his residence, and moreover, most of the statements were volunteered without any questioning by the police. The government maintains that defendant could not have had a reasonable belief that he was in custody during his encounter with the police because he was never placed under arrest, he was free to move throughout the house, and he actually directed officers to the location of drugs and weapons during the search. It is contended that defendant volunteered the

13

information concerning marijuana in the residence after they had discovered the growing operation; the atmosphere was congenial and friendly; and many of the statements provided were not the result of an "interrogation." [Government's Response, at 15]. Additionally, it is asserted that defendant's statements about having child pornography were offered by him, and not in response to any questioning by law enforcement, as they were leaving the house with items he had originally stated did not contain child pornography.

At the conclusion of the suppression hearing, defendant amended the argument set forth in his suppression motion to include the proposition that, with respect to the officers taking the discs labeled "porn," they could not legally have been seized pursuant to the plain view doctrine, and it was not immediately apparent that this was incriminating evidence of a crime. [Tr. 97]. Defendant submits that the officers were on a fishing expedition when they seized these materials.

The government responds that it was readily apparent that the officers were searching for weapons. While there is a factual dispute about whether there was a false bottom in the drawer, if the facts are as the officers attested to, there was reasonable cause to believe that the items contained some type of contraband. Regardless, it is asserted that defendant had given consent to search his residence and gave consent to seize these items. Accordingly, the government urges that the motion to suppress be denied.

The Eighth Circuit Court of Appeals has enunciated a number of factors to determine whether consent to search has been voluntarily given. United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). Some of the factors relating to the person giving consent include age, general intelligence and education, prior experience with law enforcement, and whether he or she was under the influence of drugs or alcohol. See United States v. Mancias, 350 F.3d 800, 805 (8th Cir. 2003)

(internal citations omitted). Conduct of law enforcement to be considered includes the length of the detention, whether there was physical intimidation, if the defendant was in custody or under arrest, if the police made promises or misrepresentations, if the interrogation was in a public place, and whether the accused objected to the search or stood by silently. Id. at 805.

In the instant case, defendant is a well-educated, professional person. There was nothing in any of the testimony to suggest that he was under the influence of any drugs or alcohol at the time of the incident, or that he was otherwise mentally impaired in any way. Other than his lack of experience with law enforcement officers and demonstrable naivety around them, there are no factors present in this case that would suggest that his ability to render voluntary and knowledgeable consent was compromised in any manner. There were also no factors regarding the conduct of law enforcement that would invalidate the voluntariness of his consent. The time that the officers were in his residence was not unduly lengthy; he was never in custody nor under arrest; and there was no testimony or even a suggestion by defendant that the officers offered him anything in exchange for his consent or that they made any promises or representations to him whatsoever to coerce him into allowing them to enter his home. Basically, he contends that he consented because he thought he had no choice. His assertions essentially focus on the number of firefighters and police officers present, with the latter having weapons. Other than his sole allegation, however, that an unidentified officer touched his taser, he makes no assertions that he was physically or mentally intimidated in any way. It should be noted, moreover, that this incident was alleged to have occurred after defendant had consented to have his home searched several times, and after he had volunteered information about more marijuana and weapons. The witnesses, firefighter and police officer alike, testified that defendant allowed them to come into his house upon their asking. Even the police

Case 3:09-cr-05007-MDH   Document 35   Filed 09/09/09   Page 15 of 22

officers, who felt that defendant had already given his consent to the firefighters, asked again to enter the home, which defendant allowed–either by consent or invitation. The witnesses testified that defendant, with the exception of the closet search, either stood silently by or actually assisted with the search of his residence.

The only significant conflicting testimony was what defendant did when Officer Bullard approached the closet door. Defendant testified at the suppression hearing that when Officer Bullard began to open the closet door, he put his hand on the door, pushed it shut, and told Officer Bullard that he "didn't need to look in there." [Tr. 81-82]. It was his testimony that the officer "insisted on looking in there." [Tr. 82]. Officer Bullard testified that defendant he said something to the effect that there was nothing in the closet. Defendant agreed at the hearing that he never specifically said, "don't search the closet." [Tr. 90]. Defendant admitted that it was "possibly correct" that he merely said, "there's nothing in there" when he put his hand on the closet door, and could not state with certainty that he ever said "not to look in there." [Tr. 90]. There is inconsistent testimony regarding whether he put his hand on the door before, as, or after it was being opened. That inconsistency is also reflected in the testimony adduced at the prior state suppression hearing, where the court did not suppress the evidence, and in the written reports prepared by the officers.

After careful consideration, the Court finds that defendant's specific action of placing his hand on the door, with an equivocal statement, does not constitute a legal withdrawal of consent previously given. In this case, defendant had already given consent at least twice: Once when the firefighters arrived, and again when they asked either to search the bedrooms or to search the remainder of the house. It should be noted that the Court does not find a legal distinction in this case between asking to search the bedrooms or asking to search the remainder of the house. The

Case 3:09-cr-05007-MDH   Document 35   Filed 09/09/09   Page 16 of 22

scope of that search was not limited by the firefighter's request nor by defendant's consent. He admitted during his testimony that he never told the officers that they could search, but not to look in the closet. He testified that he was fully aware of the marijuana-growing-operation in his closet. Although he testified that he was agitated, he never stated that he was so overwhelmed by the presence of the officers or what was occurring that he could not function in a voluntary manner. Given that defendant appeared to be intelligent and in control of all his faculties on the day in question, there is no discernable reason why he could not have unequivocally limited his consent or withdraw it at the point that the closet in his bedroom might to subject to being search. Based on the credible evidence before the Court, it cannot be said that defendant's actions were an unequivocal act or statement of withdrawal indicating an intent to revoke consent; that placing his hand on the door one time was an act to physically prevent the officer from opening the door; and that there was a clear command to stop.

Regarding the third time defendant gave consent for a search of his residence, he agrees that he provided that consent. Regarding the consent defendant afforded to the police, according to the testimony of the police officers, defendant told Detective Crain, in the presence of Sergeant Baker, that "yes, you guys can come on in and search." [Tr. 42]. Sergeant Baker testified on cross-examination that defendant said they could go inside because they already knew about the [grow] lights. According to Detective Crain, he asked if they could go in and look. The officer testified that defendant said that "he was growing pot for personal use and invited us back into the residence to show us what he had." [Tr. 60]. After he saw the contents of the closet, which defendant had led them back to, the officer asked for consent to search the rest of the residence, and defendant gave verbal consent. Defendant escorted the officer to the bedroom and showed them where there was

17

additional marijuana and a handgun. According to Detective Crain, he even opened the night stand drawer, after telling the officer that he had some more marijuana in the night stand. A reasonable officer would interpret defendant's words and conduct to mean that he consented to the search and that the consent was voluntarily and knowingly given. Although it was his testimony that the police officers said they did not need permission to search the residence because he had already given the fire department permission, they asked anyway, and he gave consent by either letting them in or inviting them in. After he was asked to return to the living or dining room, he further advised them of more weapons and gave their location, as well as telling them about more marijuana. Then, as the officers were leaving the residence, defendant agreed that it was on his own initiative that he told them there was child pornography on the thumb drive. He agreed to let them take the other computer equipment at that time. In view of the evidence adduced at the hearing, the Court finds that there was not an illegal search, and accordingly, the "fruits of the poisonous tree" doctrine would not apply.

Regarding the subsequent search of the second dresser drawer, where the computer disks were found, whether with a false bottom or just a different size drawer, by this time, defendant had consented to a search of his residence three times, had assisted in the search, and the officers had found evidence of drugs and a loaded weapon concealed in a dresser drawer. While defendant tries to characterize the search of the other dresser drawer as being part of a fishing expedition, the Court believes that the credible evidence supports a finding that the police officers did not exceed the scope of consent given by defendant to search his residence.

Because the Court finds that defendant gave consent in this case, it does not believe that it is necessary to address his argument, made at the close of the hearing, regarding there being no

18

exigent circumstances to support the search. Assuming, however, that this argument needed to be discussed, the Court is of the opinion that because the firefighters were acting with a good faith purpose and pursuant to their duties, and not as an excuse for discovering unrelated evidence, exigent circumstances could be deemed to exist to support their search of the residence pursuant to a 911 call because of an electrical problem, for which they were unable to discern the source. See generally United States v. Selberg, 630 F.2d 1292, 1297-99 (8th Cir. 1980. Also at the conclusion of the suppression hearing, defendant argued that the officers could not have legally seized the discs labeled "porn" pursuant to the plain view doctrine, and it was not immediately apparent that this was incriminating evidence of a crime.

In this case, the initial entry into the night stand by the officers was justified in their search for weapons. The Court finds, based on the credible evidence, that opening and looking through the second drawer was a logical continuation of searching the night stand after defendant had identified it as a repository for drugs and a loaded handgun. Whether or not there was a false bottom or simply a smaller drawer, the officers had reasonable cause to believe that the second drawer contained some type of contraband. Upon looking through the second drawer, Officer Barclay saw the CDs labeled "porn." Upon request, defendant allowed the officers to seize these items. Based on the facts adduced at the hearing, the Court finds that the continued search of the night stand was a part of the consensual search of the residence. Additionally, because defendant gave virtually unbridled consent to the officers to search his residence, and consent to seize these items, it is not necessary to address the issue of whether they were in plain view.

Based on the foregoing, the Court finds that it must be recommended that defendant's motion to suppress evidence be denied.

Case 3:09-cr-05007-MDH   Document 35   Filed 09/09/09   Page 19 of 22

Regarding defendant's motion to suppress statements he made, pursuant to <u>Miranda v. Arizona,</u> 384 U.S. 436, 444-45 (1966), a defendant's Fifth Amendment privilege against the inherently coercive effects of custodial interrogations must be protected. A person "must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time that a person is taken into custody for questioning." <u>United States v. Griffin,</u> 922 F.2d 1343, 1347 (8th Cir. 1990). While law enforcement officers may speak with a person who is not in custody without advising the person of his <u>Miranda</u> rights, the Court must consider the totality of the circumstances in determining whether a person is actually in custody. <u>Id.</u> at 1347. "Custody occurs either upon formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way." <u>Id.</u> (emphasis in original), citing <u>Miranda,</u> 384 U.S. at 344. In determining whether an individual is in custody for <u>Miranda</u> purposes, the Court should examine a number of factors including: the length of the interrogation; the accused's freedom to leave the scene; and the place and purpose of the interrogation. <u>Griffin,</u> 922 F.2d at 1349. Additionally, the Court may consider whether the person was informed that the contact was voluntary and that the suspect was free to leave; whether the subject was restrained; who initiated the contact; whether police used "strong arm" tactics and/or dominated the questioning; and whether the person was placed under arrest at the end of the questioning. <u>Id.</u> Ultimately, however, whether a custodial situation exists "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." <u>Stansbury v. California,</u> 511 U.S. 318, 323 (1994).

In weighing all the factors under <u>Griffin</u>, and based on the totality of the circumstances, the Court concludes that defendant was not in custody for purposes of being advised of his <u>Miranda</u>

rights. Regarding his freedom of movement, there was credible testimony that defendant was free to go into different parts of his own home and he did so in joining the officers as they searched. Although he was accompanied by an officer when he went to get a drink of water, there was no evidence that he was restrained in any manner. Both he and all the witnesses whose testimony addressed the issue agreed that the environment was congenial and cooperative. Even when defendant was acting very upset, these feelings appeared to stem from his frustration with himself, and not because of anything the police had done to him. There is no sign that defendant was acting under duress during the time the officers were in his home. There is no credible evidence that the fact that the officers were in uniform and carrying weapons was sufficient to have overborne defendant's will. His vague assertions about one officer reaching towards his taser, when viewed in light of all the credible testimony, does not alter this Court's conclusion that the environment was not coercive. While it is apparent that defendant made some poor judgment calls regarding what he was willing to say and do, there is no evidence that he did not voluntarily choose to speak to the officers. Testimony adduced at the hearing established that defendant consented to the search, showed the officers evidence of marijuana and firearms in the residence, and voluntarily provided statements to them. There is no disagreement that he was asked if there was more marijuana, if there were more firearms, and if there was child pornography on the disks. Because he was not in custody, however, the questions did not produce answers that were the product of illegal interrogation. Additionally, it was not disputed that defendant re-instituted contact with the officers as they were leaving, and volunteered the information that there was child pornography on the discs. Not advising defendant that any oral statements could be used against him, under these circumstances, cannot be deemed to rise to the level of "strong arm tactics," or police

Case 3:09-cr-05007-MDH   Document 35   Filed 09/09/09   Page 21 of 22

domina[tion]." Griffin, 922 F.2d at 1349. Additionally, defendant was not placed under arrest at the end of the contact with the officers. Because defendant was not in custody and because no custodial interrogation occurred, the Court finds that the police officers were not required to administer Miranda rights in this case. There was not an inherently coercive environment, given that defendant was in his own home; the atmosphere was described by every witness as cooperative and friendly; and there was no evidence of illegal questioning initiated by law enforcement officers because defendant was not taken into custody or otherwise deprived of his freedom of action in any significant way. The Court finds that defendant's statements to the officers during the entry and search of his home on July 4th, 2008, were not the product of custodial interrogation occurring in violation of Miranda.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's Motion to Suppress Evidence and Statements be denied.


 /s/ James C. England
JAMES C. ENGLAND, CHIEF
United States Magistrate Judge


Date:   9/9/09

22